Leo LOVICK and Marlys
Lovick, Appellees,

v.

WIL–RICH, a division of the Tic
United Corp., Appellant.

No. 97–1484.

Supreme Court of Iowa.

Jan. 21, 1999.

As Amended on Denial of Rehearing
March 25, 1999.

Petition for Rehearing on Amended
Opinion Denied April 12, 1999.

---

Kevin M. Reynolds and Richard J. Kirschman of Whitfield & Eddy, P.L.C., Des Moines, and Richard J. Sapp and W. Don Brittin, Jr., of Nyemaster, Goode, Voights, West, Hansell & OBrien, Des Moines, for appellant.

Gary D. McCallister of Gary D. McCallister & Associates, LTD., Chicago, Illinois, Jay P. Roberts of Roberts & Stevens, P.L.C., Waterloo, E.J. Giovannetti of Hopkins & Huebner, P.C., Des Moines, Brenda L. Head of Davis, Unrein, Hummer, McCallister & Buck, Topeka, Kansas, and John W. Walker, Jr. of Beecher, Field, Walker, Morris, Hoffman & Johnson, Waterloo, for appellees.

Bruce L. Braley of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for amicus curiae Iowa Trial Lawyers Association.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, SNELL, and CADY, JJ.

CADY, Justice.

The manufacturer of a farm cultivator appeals from a judgment entered by the district court in favor of the product user in this product liability action. We conclude the district court failed to fully instruct the jury on the negligence claim based upon a post-sale duty to warn, and this incomplete instruction constituted prejudicial error. We affirm in part, reverse in part, and remand for a new trial.

### I. Background Facts and Proceedings.

On May 20, 1993, Leo Lovick set out to cultivate a field preparatory to spring planting. He was an experienced farmer. The land was owned by Paul Rotgers and Lovick was using his cultivator.

Lovick pulled the cultivator to the field with a tractor. The wings of the cultivator were in the upright, vertical position to accommodate its transportation. Once in the field, Lovick attempted to unfold or lower the wings into position to begin cultivation.

The wings of the cultivator folded and unfolded by the operation of two hydraulic cylinders, which also held the wings in its vertical position. Additionally, the wings were secured in the upright position by a metal pin manually inserted under each wing, near the rear of the implement. The pins were designed to hold the wing in the vertical position in the event of hydraulic or mechanical failure.

Lovick positioned himself under the left wing of the cultivator to remove the first pin. The wing immediately fell when the pin was removed. Lovick was severely injured. Later investigation revealed the wing fell when Lovick removed the pin because the linkage attaching the cylinder to the wing had broken. Consequently, the pin was the only device holding the wing in its upright position at the time it was removed.[1]

---

1. Lovick's expert witness offered three explanations for the broken linkage: (1) "someone else" broke the cultivator before Lovick used it; (2) the cultivator experienced progressive "fatigue failure" which manifested itself at the same time Lovick removed the pin; and (3) Lovick broke the linkage by activating the hydraulic control mechanism without first removing the locking pins. An eyewitness observed Lovick "pounding or pulling" on the pin just prior to the accident. Lovick gave conflicting accounts of the incident, but ultimately testified at trial he removed the pin with no difficulty and did not activate the hydraulic cylinders before removing the pin.

Wil–Rich first introduced the vertical fold model cultivator into the market in 1971. Since that time it has manufactured approximately 35,000 units. The cultivator which injured Lovick was manufactured and sold by Wil–Rich in 1981. Rotgers purchased the cultivator in "the late 80s." He was at least the second owner.

The cultivator contained a warning sign which cautioned the operator to remove the pin prior to lowering the wings. Wil–Rich placed the warning on the cultivator because it believed hydraulic pressure against the wing pins could break the hydraulic cylinder. The operator's manual further warned against going under the wings to remove the pins.

In 1983, Wil–Rich received a report that a wing of one of its cultivators had fallen and injured the operator. Since that time, it received eight other such reports. In 1988, Wil–Rich began to affix a warning label to the cultivators it manufactured to caution operators of the danger of going under the wing to remove the pin. Wil–Rich added this warning in response to the reports of operators injured by a falling cultivator wing, as well as changes in engineering standards.

In 1994, Wil–Rich began a campaign to notify owners of its cultivators of the danger of falling wings. It also made a backup safety-latch kit available for installation on the wings.

Lovick instituted a strict liability and negligence action against Wil–Rich. He sought compensatory and punitive damages. At trial, Lovick successfully introduced evidence that Deere & Company, a competitor of Wil–Rich, instituted a safety program in 1983 for its similarly designed cultivator after learning of instances of the wing falling on the operator. The Deere & Company program included efforts to locate the cultivator owners, and equip the existing cultivators with a wing safety latch and an upgraded warning label. Lovick also introduced evidence of the nine other accidents involving the wing of a Wil–Rich cultivator falling on an operator.

Wil–Rich investigated the prior accidents as the information became available. It also became aware of the Deere & Company post-sale warning program in 1987, but did not institute its post-sale warning program prior to 1994 essentially due to the practical difficulties of identifying and locating the owners and users of previously sold cultivators.

The trial court submitted the case to the jury on the strict liability theory of defective design and the negligence claim of breach of a post-sale duty to warn. It also submitted punitive damages on the negligence claim. The jury returned a verdict in the amount of $2,057,000. The verdict included $500,000 in punitive damages and $400,000 in loss of consortium to Lovick's wife.

Wil–Rich appeals. It claims the trial court erred in: (1) admitting evidence the warning program by Deere & Company included a retrofit or wing latch safety component; (2) instructing the jury on the continuing duty to warn; (3) admitting evidence of other accidents; (4) using a strict liability theory to instruct the jury on the defective design theory; (5) submitting punitive damages to the jury; (6) failing to direct a verdict for Wil–Rich on the negligence claim because Lovick failed to establish a warning would have prevented the accident; and (7) failing to grant a new trial because the verdict was contrary to the evidence.

## II. Standard of Review.

■■■ We generally review the admission of evidence under an abuse of discretion standard. *Williams v. Hedican*, 561 N.W.2d 817, 822 (Iowa 1997). On the other hand, we review claims of erroneous jury instructions for errors at law. *Sheets v. Ritt, Ritt & Ritt, Inc.*, 581 N.W.2d 602, 604 (Iowa 1998). Similarly, we review rulings on a motion for directed verdict and posttrial motions for errors at law. Iowa R.App. P. 4; *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

## III. Post–Sale Duty to Warn.

We first address the issue of whether the trial court erred in instructing the jury on the duty of Wil–Rich to warn. Wil–Rich claimed it had no duty to warn following the sale. It further claimed the instruction given by the district court was too vague to permit the jury to understand the scope of the duty

or to properly determine whether it was breached.

### A. Existence of Duty.

 Our law has long recognized a duty to warn of the presence of defects or dangers. *See Lakatosh v. Diamond Alkali Co.,* 208 N.W.2d 910, 913 (1973) (common law duty). This duty is predicated upon superior knowledge, and arises when one may reasonably foresee danger of injury or damage to another less knowledgeable unless warned of the danger. *Baumler v. Hemesath,* 534 N.W.2d 650, 653–54 (Iowa 1995). The duty to warn has traditionally been applied over the years to owners and occupants of property, and more recently to the manufacturer of products. *See West v. Broderick & Bascom Rope Co.,* 197 N.W.2d 202, 209 (Iowa 1972) (adopting the modern rule from the Restatement (Second) of Torts § 388 (1965)). Today, it has assumed a prolific role in products liability actions.[2]

The body of law we have developed concerning a manufacturer's duty to warn has been predicated on warning inadequacies at the time of manufacture and sale. A growing number of jurisdictions, however, have now expanded this duty to require warnings after the sale when the product later reveals a defect not known at the time of sale. *See* 3 American Law of Products Liability § 32:79 (3d ed.1998).

The seminal case in this area is *Comstock v. General Motors Corp.,* 358 Mich. 163, 99 N.W.2d 627 (Mich.1959). In *Comstock,* the court observed the reasons for the imposition of a duty to warn at the point of sale also applied to the imposition of a duty to warn of latent defects which became known to the manufacturer after the product has been placed in the market. *Comstock,* 99 N.W.2d at 634. Since *Comstock,* other states have imposed a post-sale duty either by statute or judicial decision. *See* 3 American Law of Products Liability § 32:79 (citing jurisdictions imposing duty by statute).

 Iowa unceremoniously joined this growing trend in 1986 when our legislature enacted the products liability state-of-the-art defense statute. In establishing the state-of-the-art defense in products liability actions, our legislature added:

> Nothing contained in this section shall diminish the duty of an assembler, designer, supplier of specifications, distributor, manufacturer or seller to warn concerning subsequently acquired knowledge of a defect or dangerous condition that would render the product unreasonably dangerous for its foreseeable use or diminish the liability for failure to so warn.

Iowa Code § 668.12 (1987). Although no statutory or judicial post-sale duty to warn had been recognized in Iowa prior to the statute, section 668.12 clearly established our legislature's understanding of the duty. We previously recognized this statutory post-sale duty but have not had the occasion to begin to consider its specific application or parameters. *See Tucker v. Caterpillar, Inc.,* 564 N.W.2d 410, 412 (Iowa 1997); *Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 920 (Iowa 1990). This case presents such an occasion.

The district court recognized the existence of a post-sale duty to warn but only submitted a general reasonableness standard of care instruction to the jury.[3] Wil–Rich

---

**2.** The duty to warn has been recognized as one of the most widely-employed claims in modern products liability actions. M. Stuart Madden, 1 Products Liability § 10.1, at 358 (2d ed.1988); Douglas R. Richmond, *Products Liability: Corporate Successors & The Duty to Warn,* 45 Baylor L.Rev. 535, 537 (1993) (stating duty to warn cases have proliferated because they are less expensive for plaintiffs, warnings can nearly always make a product safer, and such claims are available under several theories of liability).

**3.** The trial court utilized Uniform Jury Instruction 1000.12. It provides as follows:

> A defendant has a continuing duty to warn users of the product concerning defects of which the defendant acquires knowledge after the product is [manufactured] [sold]. This duty exists even though the product complied with the state of the art at the time it was initially [manufactured] [sold]. If a defendant later learns its product is defective and unreasonably dangerous, then the defendant has a duty to warn those it knows or in the exercise of reasonable care should know will be affected by the product's use.

A comment to the instruction warns "[i]t may be necessary to give an additional instruction ex-

claims the instruction was legally insufficient because the duty to warn is not absolute and the instruction did not identify the important factors to consider in determining whether the duty would be breached in a particular case. It requested an instruction which told the jury it was required to give a warning if it knew the cultivator posed a substantial risk of harm, the operator could be identified and would be unaware of the harm, a warning could be effectively communicated and acted upon, and the risk of harm was great enough to justify imposing a duty.[4]

We acknowledge a post-sale duty to warn is compatible with the traditional point of sale duty to warn. *See* Frumer & Friedman, 1 Products Liability § 2.22(2) (1991). It serves the same underlying purpose to reduce the chance of injury by equalizing the asymmetry of information between the parties. It is understandable our legislature wanted to join the growing list of jurisdictions which recognize this post-sale duty. Yet, there are some distinctions which are important to recognize in considering the scope and nature of the post-sale duty.

Foremost, the burden of a manufacturer to warn product users can radically change after the sale has occurred and the manufacturer no longer has control over the product. *See Patton v. Hutchinson Wil–Rich Mfg. Co.*, 253 Kan. 741, 861 P.2d 1299, 1313 (Kan. 1993). Warning labels can be easily placed on products the manufacturer still controls. However, once the product is sold, a variety of circumstances can impede, if not make impossible, the ability of a manufacturer to warn users. *See* M. Stuart Madden, 1 Products Liability § 10.13 (2d ed.1988). Thus, while the rationale for post-sale and point of sale duties to warn are nearly identical, the parameters of those duties must be separately identified.

Most states which have considered the parameters of the post-sale duty to warn have developed various factors to guide its implementation. *See id.* The American Law Institute recently distilled some of these factors

from these decisions in the adoption of the post-sale duty to warn in the Restatement (Third) of Torts: Products Liability § 10 (1997). The Restatement uses the reasonable person test to determine liability for the failure to warn following the sale, and articulates four factors to guide the determination of the reasonableness of the seller's conduct. The Restatement provides:

(a) One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable person in the seller's position would provide such a warning.

(b) A reasonable person in the seller's position would provide a warning after the time of sale if:

(1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

(2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

(3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

(4) the risk of harm is sufficiently great to justify the burden of providing a warning.

Restatement (Third) of Torts: Products Liability § 10 (1997).

■ We agree negligence is the appropriate theory to resolve post-sale failure to warn product liability claims. This theory of recovery is consistent with our approach to our prior cases involving the duty to warn at the point of sale. *See Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 288–90 (Iowa 1994). It recognizes the analytical merger of strict liability and negligence in determining liability for failure to warn, and we perceive no reason to

---

plaining the scope of the continuing duty to warn."

**4.** The instruction requested by Wil–Rich was nearly identical to the Restatement (Third) of

Torts: Products Liability § 310 (proposed final draft, April 1, 1997). This proposed draft was approved by the American Law Institute on May 20, 1997, during the trial.

resurrect the former distinction in post-sale failure to warn claims. The fighting question is whether it is necessary to articulate the various factors to consider in analyzing the reasonableness of a manufacturer's conduct once it acquires knowledge of a defect in a product following the sale.

### B. Post–Sale Warning Jury Instruction.

 A trial court has a duty to give the jury a clear understanding of what they need to decide. *Sanders v. Ghrist,* 421 N.W.2d 520, 522 (Iowa 1988). Thus, jury instructions must thoroughly and fairly convey the applicable law to the relevant issues. *Id.* Moreover, courts must give a requested jury instruction if it correctly states the applicable law that is not embodied in other instructions. *Stover v. Lakeland Square Owners Ass'n.,* 434 N.W.2d 866, 868 (Iowa 1989). Yet, error in failing to do so does not warrant reversal unless it is prejudicial to the party. *Id.*

 As with other negligence claims, the particular facts of each case determine whether conduct is reasonable. *Johnson v. Svoboda,* 260 N.W.2d 530, 535 (Iowa 1977). While this reasonableness standard is at times alone adequate to determine liability, it is at other times better understood by reference to other factors and standards. *See Cooley v. Quick Supply Co.,* 221 N.W.2d 763, 771–72 (Iowa 1974) (whether reasonable care requires warning beyond manufacturer's immediate vendee in a particular case depends upon various factors); *Langner v. Caviness,* 238 Iowa 774, 778, 28 N.W.2d 421, 423–24 (1947) (evidence of industry practice and custom as evidence of reasonableness of defendant's conduct); *see also* 1 American Law of Products Liability § 10.16 (3d ed.1998). Furthermore, the scope and parameters of a duty of care can vary depending upon special circumstances faced by a defendant, as well as policy considerations surrounding the event. *See Dickman v. Truck Transp., Inc.,* 224 N.W.2d 459, 466 (Iowa 1974) (sudden emergency excuses conduct which would otherwise be negligent). When special circumstances exist, it is incumbent upon the court to provide a full explanation of their application.

Although we recognize a post-sale duty to warn, we have identified potential circumstances faced by manufacturers after the sale of a product not present prior to the sale. The jury instruction given in this case, however, failed to inform the jury of these circumstances, or how they might impact the reasonableness of a manufacturer's conduct. Instead, the jury was told that if Wil–Rich subsequently learned its product is defective and unreasonably dangerous, it had a duty to warn those it knows or reasonably should know will be affected by the use of the product. This is essentially the same standard applied to a point of sale warning claim. We believe this standard is insufficient to guide the jury.

 The duty to warn analysis at the point of sale essentially focuses on the foreseeability of a defective product. *See Beeman v. Manville Corp. Asbestos Disease Compensation Fund,* 496 N.W.2d 247, 252 (Iowa 1993). This standard does not, however, identify the special burdens which may exist for manufacturers to discharge this duty. Thus, if used in a post-sale case, it restricts the jury's consideration to the danger of the product and the manufacturer's foreseeability of the danger. It excludes numerous critical factors identified by the Restatement. The jury is not told to consider the manufacturer's ability to identify users, the likelihood the risk of harm is unknown, the ability to effectively communicate a warning, and any other burden in providing a warning compared to the risk of harm. These factors are critical to understanding the reasonableness of the conduct.

 We believe the post-sale failure to warn instruction must be more specific than the point of sale failure to warn instruction and inform the jury to consider those factors which make it burdensome or impractical for a manufacturer to provide a warning in determining the reasonableness of its conduct. It is prejudicial error to fail to do so. Accordingly, we adopt the Restatement (Third) of Torts: Products Liability § 10, including the need to articulate the relevant factors to

consider in determining the reasonableness of providing a warning after the sale.

■ We recognize the comments to the Restatement refer to the need for the court to consider the four factors in deciding whether a post-sale breach of duty to warn claim should reach the jury. *See* Restatement (Third) of Torts: Products Liability § 10 cmt. a. Clearly, the particular circumstances of a case may permit a trial court to utilize the factors to determine as a matter of law no duty existed. Normally, however, the jury determines whether a warning of a product danger should have been given. *Beeman,* 496 N.W.2d at 252. Thus, if the trial court finds sufficient proof to impose a duty, the Restatement factors must be further utilized so the jury can understand the extent of the duty and properly perform its function in deciding the reasonableness of the conduct. *See Patton,* 861 P.2d at 1315.

Our decision today confirms the existence of a post-sale duty for manufacturers to warn when it is reasonable to do so. The trial court may determine no duty existed in a particular case as a matter of law. *See id.* Otherwise, the trial court should instruct the jury to determine whether it was reasonable to provide a warning by using the four Restatement factors.

We recognize the Restatement approach gives rise to other issues, but they are not before us at this time. We hold trial courts must incorporate the Restatement factors in instructing the jury on the duty to warn following the sale.

## IV. The Remaining Issues Presented.

Our resolution of the issue involving the duty to warn instruction will require a new trial. Accordingly, we address most of the remaining issues presented. These issues either claim to be dispositive of other issues, or are likely to reoccur at retrial. Other issues not specifically addressed are rejected.

### A. Evidence of Deere's Safety Program.

■ The district court admitted evidence at trial detailing the safety program Deere & Company instituted in 1983 after it learned of injuries sustained by operators of their similarly designed cultivator due to falling wings. The Deere & Company program included warnings about the danger of removing the pin while under the wing, as well as notice of the availability of a safety-latch device for installation on the cultivators. The trial court admitted evidence concerning the complete program, but instructed the jury that Wil–Rich had no duty to recall or retrofit the cultivator.

Wil–Rich does not object to evidence of the post-sale actions taken by Deere to warn its consumers of the danger. Instead, it objects to the inclusion of the safety latch retrofit evidence—Wil–Rich claims any post-sale duty to warn it has does not include a duty to retrofit. Consequently, it contends evidence that Deere instituted a retrofit program was irrelevant and unfairly prejudicial. Lovick responds that Deere's entire safety program, including the safety latch program, was relevant to establish the existence of a defect, magnitude of the danger, foreseeability of use and misuse, and inadequacy of warnings on machines in use.

Lovick did not challenge the trial court's ruling that Wil–Rich had no duty to retrofit. *See Burke v. Deere & Co.,* 6 F.3d 497, 509 (8th Cir.1993) (recognizing Iowa law does not impose a duty to retrofit a product); *see also* 63 Am.Jur.2d *Products Liability* § 257 (1997); Lisa Ann Meyer, Annotation, *Products Liability: Manufacturer's Post–Sale Obligation to Modify, Repair, or Recall Product,* 47 A.L.R.5th 395, 405 (1997). Consequently, we must determine if the retrofit evidence is relevant for some other purpose.

Relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the cause more probable or less probable than it would be without the evidence." Iowa R. Evid. 401. "Although relevant, evidence may be excluded if its probative values are substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 403.

We agree with Wil–Rich that the admission of Deere's retrofit program created a danger of a prejudicial inference that it should have developed and implemented a similar program. Yet, this evidence is also probative of the nature of the danger involved and the uses of the implement. Con-

sequently, we cannot conclude the district court abused its discretion by admitting the evidence. On retrial, however, we caution the trial court regarding undue emphasis of Deere's retrofit program in light of its limited probative value and its potential for unfair prejudice.

### B. Evidence of Other Accidents.

■ Evidence of other incidents is admissible for a variety of purposes, including: (1) the existence and nature of the defect; (2) causation; (3) notice; and (4) impeachment or rebuttal. Francis H. Hare, Jr., *Admissibility of Evidence Concerning Other Similar Incidents in a Defective Design Product Case: Courts Should Determine"Similarity" by Reference to the Defect Involved,* 21 Am. J. Trial Advoc. 491, 496 (1998) [hereinafter Hare]; Robert A. Sachs, *"Other Accident" Evidence in Product Liability Actions: Highly Probative or an Accident Waiting to Happen?,* 49 Okla. L.Rev. 257 (1996); *Burke,* 6 F.3d at 506. Although older cases often excluded evidence of prior incidences, the current trend is toward the inclusion of such evidence. Hare at 499, 508 n. 75; Ferdinand S. Tinio, Annotation, *Products Liability: Admissibility of Evidence of Other Accidents to Prove Hazardous Nature of Product,* 42 A.L.R.3d 780, 784 (1972).

■ Our case law supports the inclusion of prior accident evidence to show the existence of a dangerous condition. Notwithstanding, a foundational showing must indicate the prior accidents occurred under substantially the same circumstances.[5] *See Fell,* 457 N.W.2d at 920; *see also* 63A Am. Jur.2d *Products Liability* § 1033 (1997) (evidence of substantially similar accident may be introduced in strict liability design defect action where factors which produced prior failure are substantially similar to factors which produced present failure).

■ We have considered the substantial similarity requirement in several cases involving products liability. *Fell,* 457 N.W.2d at 920 (finding prior accidents did not occur

under substantially the same circumstances where plaintiff's injury occurred in the beveled gears of an elevator and other injuries did not occur in the beveled gears); *Eickelberg v. Deere & Co.,* 276 N.W.2d 442, 445 (Iowa 1979) (holding other incidents not substantially similar to plaintiff's combine injury where plaintiff had been standing nearby and caught some clothing in one of the combine belts, while in one other incident a shield, present on the combine which injured plaintiff, had been removed, and in another incident the injured party was coming out from beneath the combine when the injury occurred); *Sandry v. John Deere Co.,* 452 N.W.2d 616, 618 (Iowa App.1989) (holding in strict liability action by mechanic whose hand was sucked into combine's rotating fan while completing repairs, evidence of three other accidents in which operators' hands contacted fan was properly admitted); *Rattenborg by Rattenborg v. Montgomery Elevator Co.,* 438 N.W.2d 602, 606 (Iowa App.1989) (holding evidence of two subsequent accidents involving escalator which injured mall customer admissible in action against escalator manufacturer, where injured customer's shoe had become lodged in escalator and the two subsequent incidents involved situations in which shoe became lodged in escalator); *Oberreuter v. Orion Indus., Inc.,* 398 N.W.2d 206, 211–12 (Iowa App.1986) (holding evidence of other accident that was not shown to have involved similar antenna or circumstances was properly ruled inadmissible on relevancy grounds). Identical circumstances are not required to prove substantial similarity. *Rattenborg by Rattenborg,* 438 N.W.2d at 606. Where defendant has ample opportunity to show differences by cross-examination or by its own witnesses, the differences may go to the weight rather than the admissibility of the evidence. *Id.*

■ Lovick offered evidence of nine prior accidents to prove the existence of a dangerous condition on his strict liability claim. Wil–Rich claims the district court erroneously admitted five of the nine prior accidents. It maintains the five accidents occurred un-

---

5. Generally, in negligence cases, evidence of prior incidences is admissible if there is a showing of substantial similarity and the occurrence was not too remote in time. *Eickelberg v. Deere &*

*Co.,* 276 N.W.2d 442, 445 (Iowa 1979). In strict liability cases the temporal element does not apply because knowledge or notice of a dangerous condition is not an issue in such actions. *Id.*

der circumstances significantly different than those in Lovick's accident.

The first accident Wil–Rich claims was not substantially similar involved Roman John. He died when a Wil–Rich cultivator wing fell on him. The wing fell because a cylinder pivot pin connecting the clevis to the cylinder arm of the wing lift linkage was missing or had been removed. The second accident involved Roy Lipetzky. He also died as a result of a cultivator wing falling on him. In his case, a cylinder pivot pin was missing. The third accident involved Ryan Patton. He suffered injuries rendering him a paraplegic after a smaller cultivator wing fell on him. This accident occurred because the replacement cylinder was not properly charged. The fourth accident involved Leo Langenfeld. He was also injured by a Wil–Rich cultivator when the wing fell on him. He was tightening a newly installed shovel on the wing when his son pulled the lock pin. Finally, the fifth accident was described in a letter from an attorney and involved an individual identified as Mr. Sedler. After removing the pin, the wing fell causing Sedler injuries.

While Wil–Rich attempts to distinguish the various origins of each incident resulting in the collapse of the cultivator wing, their commonality was the location of the wing lock bracket which caused the operator to come under the wing to remove the lock. The design defect therefore concerned the location of the lock rather than the technical events creating the possibility for the wing to fall. This evidence was clearly relevant and was highly probative on the issue of the existence of a dangerous condition. Further, we find no merit in Wil–Rich's argument that references to the fatalities or Patton's testimony from his wheel chair was unfairly prejudicial. Accordingly, we find no abuse of discretion by the admission of the evidence.

## C. Merger of Negligence–Strict Liability Theories.

The trial court submitted the design claim on a strict liability theory. Wil–Rich claims this is an unfair standard for manufacturers. It claims the risk-utility analysis under the negligence theory should be utilized.

 Products liability law broadly refers to the legal responsibility for injury resulting from the use of a product. *Smith v. Air Feeds, Inc.,* 519 N.W.2d 827, 830 (Iowa App. 1994). It encompasses three separate and distinct theories of liability: negligence, strict liability, and breach of warranty. *See id.;* 63 Am.Jur.2d *Products Liability* § 3 (1996). Although each is a separate and distinct theory of recovery, the same facts often give rise to all three claims. *Smith,* 519 N.W.2d at 830. The underlying theories ordinarily concern improper design, inadequate warnings, or mistakes in manufacturing. *Id.*

In the context of a design defect claim, there is currently an academic debate over whether the distinction between strict liability and negligence theories should be maintained when applied to a design defect case. *See* Keith Miller, *Design Defect Litigation in Iowa: The Myths of Strict Liability,* 40 Drake L.Rev. 465 (1991) [hereinafter Miller]; Sheila L. Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence,* 33 Vand. L.Rev. 593 (1980); Kristine Cordier Karnezis, Annotation, *Products Liability: Modern Cases Determining Whether Product Is Defectively Designed,* 96 A.L.R.3d 22, 33–34 (1979); 63A Am.Jur.2d *Products Liability* §§ 933, 934. The new Restatement (Third) recently stirred the debate by dropping the distinction and adopting functional rules rather than the traditional doctrinal labels. *See* Restatement (Third) of Torts: Products Liability § 2 cmt. n (1997). Essentially, it dropped the consumer expectation test traditionally used in the strict liability analysis and adopted a risk-utility analysis traditionally found in the negligence standard, which in most instances will require proof of a reasonable alternative design to establish a design defect. *Id.* § 2. We are not asked to adopt this new Restatement in our review of this case, but to recognize the merger between strict liability and negligence in design defect claims.

 In adopting strict liability for defective products, we specifically recognized that the theory did not replace claims based on negligence. *Hawkeye–Security Ins. Co. v. Ford Motor Co.,* 174 N.W.2d 672, 685 (Iowa 1970). Moreover, we have consistently recognized a distinction between the two theories. *Aller v. Rodgers Mach. Mfg. Co.,* 268 N.W.2d 830, 835 (Iowa 1978). This traditional distinction is that strict liability claims focus on the condition of the product, while

negligence focuses on the conduct of the defendant. *Id.; Chown v. USM Corp.*, 297 N.W.2d 218, 220 (Iowa 1980). In strict liability, the plaintiff must establish the product was in a defective condition and unreasonably dangerous to the consumer. *Chown*, 297 N.W.2d at 220. In negligence, the plaintiff must show the product was unreasonably dangerous because the manufacturer failed to use reasonable care. *Id.*

█ At the same time, we have readily acknowledged the similarities between the two theories. *See Aller*, 268 N.W.2d at 835. This has prompted us to merge the theories in the context of a failure to warn claim. *See Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 288–90 (Iowa 1994). Moreover, we have recognized the growing number of courts and commentators that have found no practical difference between strict liability and negligence theories in defective design cases, and have even merged the doctrines in a defective design case for enhanced injuries. *See Hillrichs v. Avco Corp.*, 478 N.W.2d 70, 75–76 n. 2 (Iowa 1991), *abrogated by Reed v. Chrysler Corp.*, 494 N.W.2d 224 (Iowa 1992).

█ Although we recognize the merits of the merger of negligence and strict liability in design cases, we nevertheless decline the opportunity to do so in this case. First, the trial court did not instruct on both negligence and strict liability theories. It only instructed on strict liability. The instruction to the jury included the risk-utility balancing analysis utilized in negligence. Thus, even if strict liability actually applies negligence principles, no prejudice occurred. Secondly, the Restatement (Third) was adopted during the pendency of this action. We should not merge the two theories without additionally considering the adoption of the new Restatement. However, because the new Restatement generally adopts an alternative design burden, we refrain from considering the matter until that issue is specifically raised.[6] Furthermore, our legislature has adopted the state-of-the-art defense, which could be impacted if we were to adopt the alternative design requirement. *See* Miller at 504.

In conclusion, we are unable to find legal error occurred by the instruction submitted by the trial court. We decline at this time to adopt the merger of strict liability and negligence in defective design cases.

**D. Punitive Damages.**

Wil–Rich claims the evidence was insufficient to support punitive damages. It also claims any evidence to support punitive damages cannot be derived from conduct prior to the time the post-sale duty to warn was created.

█ Punitive damages may be recovered at trial if "the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1 (1995). The conduct must be more than merely objectionable, but must follow the standards of section 668A.1. *Beeman*, 496 N.W.2d at 255. Furthermore, mere knowledge sufficient to initiate a duty to warn does not meet the higher standard for punitive damages. *Id.* at 256.

█ Viewing the evidence in the light most favorable to Lovick, we agree with the trial court that punitive damages were properly submitted to the jury. There was evidence Wil–Rich failed to institute a warning campaign for numerous years despite knowledge of numerous similar incidents involving its cultivator and knowledge of the efforts of Deere & Company to warn their users of the danger. There was also some inference from the evidence that Wil–Rich acted indifferently to any need to warn of the potential for danger.

We also reject the claim by Wil–Rich that it was improper for the jury to consider its conduct prior to the date the post-sale duty to warn was recognized in Iowa. We think evidence of conduct both before and after the failure to warn can be relevant. Although the earlier conduct of Wil–Rich would not alone support punitive damages, it may be appropriately considered by the jury in determining whether its conduct in failing to institute a warning program constituted willful and wanton disregard.

---

**6.** We have previously indicated that a plaintiff must prove "an alternative safer design that is practical under the circumstances" in a state tort claims action involving a claim the state failed to provide safe play equipment. *Hawkeye Bank v. State*, 515 N.W.2d 348, 352 (Iowa 1994). Although plaintiffs frequently present evidence of an alternative design in products liability design defect actions, we have not been presented with a claim to make it an element of proof. *See Hillrichs*, 478 N.W.2d at 75 (proof of alternative safer design in crashworthiness claim).

### E. Proximate Causation—Open and Obvious Danger.

Wil–Rich claims Lovick's failure to warn claim must be dismissed as a matter of law because there was no evidence a warning would have prevented the incident. It further argues it had no duty to warn as a matter of law because the danger of a wing falling in the event of hydraulic failure was open and obvious. Wil–Rich asserted both claims in a motion for directed verdict, which the district court overruled.

 The plaintiff in a products liability action must establish a causal relationship between the alleged negligence and injury. *Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 858 (Iowa 1994). This requires a showing that the manufacturer's conduct was a substantial factor in the injury. *Id.* The defect in the product only needs to be a proximate cause, not the proximate cause. *Beeman*, 496 N.W.2d at 254. Ordinarily, the question of proximate causation is for the finder of fact. *Boham v. City of Sioux City*, 567 N.W.2d 431, 435 (Iowa 1997). It will be decided as a matter of law only in extraordinary cases. *Id.*

 In the context of a failure to warn claim, proximate cause can be established by showing a warning would have altered the plaintiff's conduct so as to avoid injury. Wil–Rich points out a warning would not have altered the incident in this case because Lovick admitted he made no effort to read any of the other warnings on the cultivator. On the other hand, Lovick offered expert testimony that an appropriate and conspicuously located warning would have given the operator an opportunity to read it as well as to begin to appreciate the danger. The same expert also opined that the lack of warning contributed to the injuries sustained in the case.

Wil–Rich nevertheless argues the danger was open and obvious. Thus it claims it not only had no duty to warn but there can be no causal relationship between the lack of warning and the injury. *See Balder v. Haley*, 399 N.W.2d 77, 81–82 (Minn.1987) (holding no causal relationship existed between injury and failure to warn as a matter of law when plaintiff was aware of danger presented).

 There is no duty to warn when risks are known and obvious. *Olson*, 522 N.W.2d at 291. However, even when a danger is known or obvious, a duty of care may still exist if harm can still be anticipated. *See Konicek v. Loomis Bros., Inc.*, 457 N.W.2d 614, 618 (Iowa 1990) (rule applied to possessor of land); *see also Carr v. San–Tan, Inc.*, 543 N.W.2d 303, 306 (Iowa 1995). Here, Lovick admitted he knew the wing could fall when the safety pin was removed if there was a hydraulic failure. Yet, this neither established a dangerous condition was known and obvious, or that there was no reasonable belief Lovick would have altered his conduct had a warning been given.

The important point in the resolution of this issue lies in the known requirement of the analysis. *See Konicek*, 457 N.W.2d at 618. Lovick may have understood the wing would fall if there was a hydraulic failure, but he did not know hydraulic failure had occurred. Thus, it cannot be said as a matter of law he understood the probability and gravity of the threatened harm. *See id.* Nor can we conclude the danger should have been obvious to a reasonable person under the circumstances.

We conclude the trial court properly overruled the motion for directed verdict.

### V. Conclusion.

Our resolution of the issues in this case requires a new trial only on the claim for punitive damages. We affirm the verdict for compensatory damages of $1,557,000. The jury found Wil–Rich was at fault in response to special interrogatories separately submitted on the strict liability and negligence theories. Conversely, the jury found Lovick was

not at fault. Because we find the strict liability theory was properly submitted to the jury and the jury determined there is no fault to compare, error in the negligence instruction did not impact the compensatory damage award. Punitive damages, however, were only submitted to the jury on the negligence theory. We reverse the award of punitive damages and remand the case for a new trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL.**