HECHT, Justice
(concurring in part and dissenting in part).
I join the majority’s analysis with respect to Huck’s claims against PLIVA. As I believe the majority’s[18] “product-identification causation requirement,” however, has no application in a case where the product and warning allegedly responsible for injury have been identified, and because I believe our caselaw regarding duty and factual causation support the possibility of the brand defendants’ liability here, I respectfully dissent from the majority’s analysis and disposition of the claims against the brand defendants.
I. Iowa Products Liability Law and Mulcahy.
We have previously explained the law of products liability in Iowa “may involve causes of action stated in negligence, strict liability, or breach of warranty,” among others. Bingham v. Marshall & Huschart Mach. Co., 485 N.W.2d 78, 79 (Iowa 1992). We have noted these three theories are separate and distinct theories of recovery, and a single set of facts may give rise to any combination of the three. Loviclc v. Wil-Rich, 588 N.W.2d 688, 698 (Iowa 1999). Typically, the underlying theories will involve claims of improper design, inadequate warnings, or defects in manufacturing. Id.
The imposition of liability for manufacturing defects has a long history in Iowa caselaw. See, e.g., Hawkeye-Sec. Ins. Co. v. Ford Motor Co., 174 N.W.2d 672, 684 (Iowa 1970). In Hawkeye, we adopted the special, narrow principle of strict liability found in section 402A of the Restatement (Second) of Torts. Id. We explained that for various policy reasons, a commercial seller of a defectively manufactured product may be liable for harm caused by the defect regardless whether the plaintiff might establish negligence or breach of warranty by the seller. Id.; see also Restatement (Third) of Torts: Prods. Liab. § 1 cmt. a, at 7 (1998). While the facts in Hawkeye gave rise only to a claim of manufacturing defect, our explanation of strict liability principles suggested the strict liability theory might be applicable in cases involving allegations of design defect as well. Hawkeye, 174 N.W.2d at 684 (quoting authority applying strict liability when “ ‘the defect arose out of the design or manufacture’ ” of the product). We gave no indication whether the theory might also apply in a case giving rise to a claim of failure to warn, and it was not until many years later we concluded failure-to-warn claims typically invoke a reasonableness standard incompatible with a strict liability theory. See Olson v. Prosoco, Inc., 522 N.W.2d 284, 289-90 (Iowa 1994); see also Restatement (Third) of Torts: Prods. Liab. § 1 cmt. a, at 6-7.
After setting forth the justifications for our adoption of the strict liability theory given the claim of manufacturing defect before us in Hawkeye, we took care to note analysis of any claim of negligence was “a *383 different matter.” Hawkeye, 174 N.W.2d at 685. We had no occasion to decide in Hawkeye how theories of negligence or strict liability might apply in cases not involving a manufacturer, because the special strict liability rule at issue there and elucidated in section 402A had no application to a party not engaged in the activity of making or selling a product as part of its business. See Restatement (Second) of Torts § 402A cmt. f at 350-51 (1965). While it may often be deceptively simple to regard an actor’s liability for injuries related to a product as “strict,” we cautioned in Hawkeye, the Restatement (Second) did not preclude liability based on the alternative ground of negligence when negligence could be proved — the special rule of section 402A often simply had no application to those claims. Hawkeye, 174 N.W.2d at 684-85; see also Wright v. Brooke Grp. Ltd., 652 N.W.2d 159, 164 (Iowa 2002).
We more recently addressed the prospect of liability for injury caused by a product in Wright, a case presenting a claim of design defect. Wright, 652 N.W.2d at 169. We acknowledged our conclusion in Olson that cases involving claims of failure to warn should be analyzed under the rubric of negligence. Wright, 652 N.W.2d at 166. We noted the Restatement (Third) of Torts: Products Liability had, in addressing claims of design defect, abandoned the consumer-expectations test traditionally employed in strict liability analyses in favor of a risk-utility test typically found in negligence analyses. Id. at 169. We concluded we favored the Restatement’s preference for avoiding doctrinal designation of design-defect claims as claims involving negligence or strict liability. Id. Like the drafters of the Restatement, we explained, we favored a functional risk-utility analysis for these claims without application of a doctrinal label. Id. We therefore adopted the framework for analyzing the liability of sellers and distributors of products for manufacturing defects, defective designs, and inadequate instructions and warnings found in sections 1 and 2 of the Restatement (Third) of Torts: Products Liability. Wright, 652 N.W.2d at 169; see also Restatement (Third) of Torts: Prods. Liab. §§ 1-2 at 5, 14. In so doing, we reiterated the Restatement’s recognition that a traditional conception of strict liability may well be appropriate in manufacturing defect cases, but that negligence principles will often be more suitable in cases involving other types of claims. Wright, 652 N.W.2d at 168.
In the course of our analysis in Wright, we identified two principles further illuminating our examination of the brands’ obligations here. First, we suggested that in certain instances, manufacturers and other parties may be liable in tort for damages suffered as a result of product defect, regardless whether the parties actually produce the specific object causing the damages. See Wright, 652 N.W.2d at 173 (examining civil conspiracy scenario where “manufacturers agree to suppress information about their product for the lawful purpose of facilitating the sale of their product, and in effectuating this plan subject themselves to liability for failure to warn of the risks of using their product”). Second, and more importantly for purposes of our analysis here, in examining a claim for failure to warn, we explained “what is really important is that the statements were made for the purpose of influencing the action of another,” and these claims need not “involve[ ] a business transaction between the parties.... ” Id. at 175-76. In Wright then, as in Hawkeye, we took care to establish that specific theories of products liability, whether strict liability or otherwise, did not displace other claims of negligence, and that each theory of liability must be *384 analyzed in terms of the relevant facts and legal principles. Wright, 652 N.W.2d at 176; Hawkeye, 174 N.W.2d at 685.
Long before we made these analytical refinements to our law of products liability in Wright, we confronted certified questions from a federal case involving parents who had suffered damages as a result of the mother’s ingestion of DES during pregnancy. See Mulcahy v. Eli Lilly & Co., 386 N.W.2d 67, 69 (Iowa 1986). Unable to identify the manufacturer of the DES ingested by the mother, the parents brought suit against twenty-five drug companies who had manufactured or marketed DES during the period in which the mother had ingested it. Id. The parents brought claims of strict liability, negligence, misrepresentation, and breach of warranty, among others. Id. We made no reference to whether specific claims of manufacturing defect, design defect, failure to warn, or any others had been advanced, but we gave no indication we had any occasion to consider the DES manufacturers’ liability for claims of design defect or failure to warn.[19] See id. at 69-70.
Setting forth legal principles applicable for analyzing the parents’ tort claims, we noted a “plaintiff in a products liability action must ordinarily prove that a manufacturer or supplier produced, provided or was in some way responsible for the particular product that caused the injury.” Id. at 70. As authority for that proposition, we cited the Restatement (Second) of Torts section 402A — the strict liability provision having no application to negligence claims — and our earlier case of Osborn v. Massey-Ferguson, Inc., 290 N.W.2d 893, 901 (Iowa 1980). Mulcahy, 386 N.W.2d at 70. In Osborn, we had similarly noted claims of strict liability for manufacturing defects typically involve a requirement of manufacture by the defendant, but we had distinguished the negligence claims at issue and noted those claims were to be analyzed in accordance with our standard negligence principles. See Osborn, 290 N.W.2d at 901; see also Wright, 652 N.W.2d at 168 (explaining principles underlying “strict liability [are] appropriate in manufacturing defect cases, but negligence principles are more suitable for other defective product cases”). We cited our earlier case of Schütz v. Cullen-Schiltz & Associates, Inc., 228 N.W.2d 10, 16-18 (Iowa 1975), as illustrative of the appropriate negligence analysis. Osborn, 290 N.W.2d at 901.
In Schütz, we had encountered a claim alleging defective design of a sewage treatment facility. Schütz, 228 N.W.2d at 17. We explained that to prevail on a claim of negligent design by the engineers, the claimant must prove the work fell short of the “degree of skill, care and learning ordinarily possessed and exercised” in the engineering profession and the substandard care resulted in the damage. Id. Notably, our negligence analysis in Schütz imposed no requirement that the engineers had built or manufactured the defective sewage treatment facility. See id. Indeed, they had not, as they had merely provided plans and specifications for the facility’s construction to an independent contractor, who had independent obligations to inspect the site and circumstances attending the project and to diligently pursue, supervise, and complete the construction. Id. at 12-13. Instead, for purposes of the negligence analysis, we made clear the important questions in Schütz were whether the *385 engineers had negligently designed the facility and whether that negligence had caused the damages suffered. Id. at 17; see also McCarthy v. J.P. Cullen & Son Corp., 199 N.W.2d 362, 367-68 (Iowa 1972) (examining architects’ duties with respect to plans and specifications and noting duty extended to protection of owners of adjacent properties from harms “which reasonably could be expected to flow from” the plans).
We acknowledged and employed the principles of these cases in Mulcahy neither to elide theories of strict liability and negligence, nor to suggest all products liability claims were to be treated as claims of manufacturing defect, but to ensure a “causal connection between the defendant’s product and plaintiffs injury.” Mulcahy, 386 N.W.2d at 70. Our general negligence principles, we noted, require a claimant to prove “the defendant caused the complained of harm or injury.” Id. at 72. In a case involving so many apparent manufacturers of DES, some of which had not been named as defendants, we explained, the claimants could not prove any of the named defendants “was in some way responsible for,” or had actually “caused the injury to” the plaintiff. Id. at 70, 72. In a case involving fewer manufacturers, we noted, the plaintiff might not have run up against the same causation problem — if, for instance, the “plaintiff established that only two manufacturers’ DES products were sold at a certain pharmacy, and [she] bought her DES only at that pharmacy but e[ould not] identify which brand she purchased.” Id. at 73. Other theories of liability, such as enterprise liability, might also have “avoid[ed] the legal causation problem that arises from an inability to identify the manufacturer of the specific injury-causing product” in cases involving so many possible responsible parties, but we found those theories inapplicable given the facts before us. Id. at 72. Instead, given the sheer number of possibly responsible parties, we declined to adopt the special liability theories advanced by the plaintiffs and concluded we would not impose “liability upon a manufacturer for harm it may not have caused.” Id. at 76.
Based on our products liability principles, and based on the specific problem at issue in Mulcahy, I believe our Mulcahy analysis provides useful but limited guidance for our resolution of the case before us. We are not faced here with a claim of strict liability for manufacturing defect on behalf of the brands, and thus the strict liability causation requirement that the manufacturer be responsible for the manufacturing defect, set forth in cases like Hawkeye and Osborn and imported in Mulcahy, is inapplicable here. See Mul-cahy, 386 N.W.2d at 70; Osborn, 290 N.W.2d at 901; Hawkeye, 174 N.W.2d at 684; see also Wright, 652 N.W.2d at 164. More importantly for purposes of our analysis with respect to the claims of negligence here, we are not faced with a case involving numerous possibly responsible defendants or involving the possibility an unnamed party might actually be responsible for the harm suffered in lieu of any named defendant. See Mulcahy, 386 N.W.2d at 71-72. Instead, by contrast, the parties here have stipulated to the relevant facts: the brands designed and manufactured branded Reglan; PLIVA manufactured the generic product actually ingested; and federal laws and regulations establish various obligations for PLIVA and the brand defendants. The causation problem we identified in Mulcahy therefore does not present itself here, and although our exposition of general negligence principles has application here, Mulcahy gives us no specific guidance as to how to resolve the negligence claims in scenarios like this one where all relevant actors have been identified. Instead, the *386 negligence principles we have set forth in numerous cases like Schütz must guide our resolution here, and those cases have never required an actor who has breached an obligation of care be a manufacturer for purposes of tort liability. See Schutz, 228 N.W.2d at 17-18; see also Bredberg v. PepsiCo, Inc., 551 N.W.2d 821, 327 (Iowa 1996) (noting product designers are also subject to strict liability claims).
Moreover, the brands have not offered any explanation as to why we must treat them as manufacturers for purposes of our negligence analysis. In fact, all parties involved have stipulated the brands were not manufacturers of generic metoclo-pramide at the time of Huck’s ingestion. As noted, we have in numerous prior products liability cases held an actor need not be a manufacturer for purposes of analyzing liability, regardless whether the claim is one of negligence or strict liability. See Weyerhaeuser v. Thermogas Co., 620 N.W.2d 819, 825 (Iowa 2000) (noting several justifications for holding an assembler liable in both negligence and strict liability for the failure of a component it did not manufacture); Bredberg, 551 N.W.2d at 327; Schütz, 228 N.W.2d at 18; cf. Wright, 652 N.W.2d at 169 (adopting sections 1 and 2 of the Restatement (Third) of Torts: Products Liability); Clark v. McDaniel, 546 N.W.2d 590, 592-94 (Iowa 1996) (holding used-car dealer liable for misrepresentation of car quality). Our negligence cases have always required a negligent act or omission on the part of an actor, causation, and damages within the actor’s scope of liability. See, e.g., Thompson v. Kaczinski, 774 N.W.2d 829, 834 (Iowa 2009); Stotts v. Eveleth, 688 N.W.2d 803, 807 (Iowa 2004); Van Essen v. McCormick Enters. Co., 599 N.W.2d 716, 718 (Iowa 1999). As we have taken great care to emphasize in our products liability cases, no principle of products liability law displaces that framework. See Wright, 652 N.W.2d at 164; Hawkeye, 174 N.W.2d at 685.
Courts from numerous jurisdictions have recognized these principles and declined to dismiss claims against brand defendants given similar factual circumstances. See, e.g., Dolin v. SmithKline Beecham Corp., No. C6403, 2014 WL 804458, at *6 (N.D.Ill. Feb. 28, 2014) (“[Tjhese parties stood in a relationship to one another that, while clearly not ‘direct,’ was sufficient for the law to impose a duty of reasonable conduct upon GSK for the benefit of Plaintiff.”); Chatman v. Pfizer, Inc., 960 F.Supp.2d 641, 654 (S.D.Miss.2013) (“Chatman may pursue her common-law claims under ‘old’ state law theories of liability, even though she may have been injured by a product manufactured by another.”); Kellogg v. Wyeth, 762 F.Supp.2d 694, 704 (D.Vt.2010) (“To date, however, Vermont has not eliminated common law actions for negligence or fraud merely because they involve products.”); Easter v. Aventis Pasteur, Inc., No. 5:03-CV-141 (TJW), 2004 WL 3104610, at *9 (E.D.Tex. Feb. 11, 2004) (“Lilly, as a designer, has a duty to develop a safe design for thimerosal. Also, Lilly’s design of and intimate knowledge about thimerosal also gives rise to a duty to inform users of hazards associated with the use of thimerosal. Therefore, the Court finds that the plaintiffs have adequately stated a design defect claim against Lilly.”); Wyeth, Inc. v. Weeks, — So.3d-,-, 2013 WL 135753, at *19 (Ala. Jan. 11, 2013), reargument granted (June 13, 2013) (“Under Alabama law, a brand-name drug company may be held liable for fraud or misrepresentation (by misstatement or omission), based on statements it made in connection with the manufacture of a brand-name prescription drug, by a plaintiff claiming physical injury caused by a generic drug manufactured by a different company.”); Conte v. Wyeth, *387 Inc., 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299, 320-21 (2008) (“We hold that Wyeth’s common-law duty to use due care in formulating its product warnings extends to patients whose doctors foreseeably rely on its product information when prescribing metoclopramide, whether the prescription is written for and/or filled with Reglan or its generic equivalent.”); Lance v. Wyeth, 85 A.3d 434, 461 (Pa.2014) (“There has been no supported presentation here which would persuade us to immunize companies from the responsibility to respond in damages for such a lack of due care resulting in personal injury or death.”); Clark v. Pfizer, Inc., No. 1819, 2008 WL 7668730, 2008 Phila. Ct. Com. PI. LEXIS 74, *29 (Ct.Com.P1.2008) (“[T]he relationship between the purchasers of generic Gabapen-tin and these defendant [brand] manufacturers herein is that of purchaser of drugs which never would have been purchased but for defendants’ [conduct].”). See generally Allen Rostron, Prescription for Fairness: A New Approach to Tort Liability of Brand-Name and Generic Drug Manufacturers, 60 Duke L.J. 1123, 1160 (2011) [hereinafter Rostron] (noting courts have recognized “[n]egligence and strict products liability are separate and distinct bases for liability” and “do not automatically collapse into each other merely because there are some situations in which a plaintiff might be able to assert both types of claims” (internal quotation marks omitted)).
Several courts have recognized that given the obligations created by the Hatch-Waxman Act, the causation problem we identified in Mulcahy is inapplicable here, because “whether a consumer ingests the name-brand or generic version of a given drug is immaterial as to the likelihood that negligence in the design or warning label of that drug will cause injury.” Dolin, 2014 WL 804458, at *5; see also, e.g., Schedin v. Ortho-McNeil-Janssen Pharm., Inc., 808 F.Supp.2d 1125, 1131 (D.Minn. 2011) (“[U]nder the pre-2007 statutory framework ... a brand-name manufacturer was the only entity in the trifeeta of actors (the FDA, the brand-name manufacturer, and the generic) that could strengthen an inadequate label.”), affd in part, rev’d in part on other grounds, 700 F.3d 1161 (8th Cir.2012); Kellogg, 762 F.Supp.2d at 702 (“A reasonable jury could conclude that inadequate, misleading and inaccurate information provided by the [brand defendants] was a ... cause of her injury.”); Weeks, — So.3d at-, 2013 WL 135753, at *19 (“In short, the patient must show that, but for the false representation made in the warning, the prescribing physician would not have prescribed the medication to his patient.”); Rostron, 60 Duke L.J. at 1164 (“Throughout the long line of precedent that flowed out of Foster, courts have repeatedly made the same mistake, dwelling on the irrelevant concept of liability being imposed on multiple manufacturers because of uncertainty about who made a product and conflating that concept with the separate and distinct issue of whether a manufacturer can be liable for wrongdoing other than making and selling the product the plaintiff received.”). Several courts have reasoned “case law, commonsense and fairness dictates” the brands cannot both avoid claims of strict products liability on the ground they were not manufacturers of the generic version of the drug, and avoid claims of negligence on the ground they were manufacturers of some other drug. Chatman, 960 F.Supp.2d at 653 (“[T]hey cannot have it both ways.”); see also Dolin, 2014 WL 804458, at *4 (“GSK has not shown why Plaintiff should be precluded from claiming at common law that GSK, independent of its capacity as a manufacturer ... was negligent in connection with its [other responsibilities] .... ”).
*388 Many courts have recognized proper resolution of negligence claims turns not on a question of whether a product is somehow involved, but on an analysis of traditional negligence principles. See, e.g., Dolin, 2014 WL 804458, at *4-5 (rejecting defense of manufacturer immunity and applying Illinois negligence law to claims against brand defendants); Easter, 2004 WL 3104610, at *9 (rejecting defense of manufacturer immunity and applying Texas negligence law to claims against brand defendants); Lance, 85 A.3d at 458-60 (rejecting defense of manufacturer immunity and applying Pennsylvania negligence law to claims against brand defendants); see also Kolarik v. Corey Int'l Corp., 721 N.W.2d 159, 162-63, 166 (Iowa 2006) (noting olives were “products” for purposes of products liability and nevertheless allowing plaintiff to proceed on general negligence claim for failure to warn).
Finally, several courts have persuasively argued a decision to eviscerate an enormous segment of our negligence law and “immunize companies from the responsibility to respond in damages for such a lack of due care resulting in personal injury” is a “weighty and consequence-laden policy-making” judgment best left to Congress and the state legislatures — none of which have granted such immunity just yet. Lance, 85 A.3d at 461-62; see also Chat-man, 960 F.Supp.2d at 654-55 (noting “the Mississippi legislature has abolished the requirement of privity ‘in all causes of action for personal injury ... brought on account of negligence’ ” (quoting Miss. Code Ann. § 11-7-20 (West, Westlaw through 2014 Regular (end) and First Extraordinary (end) Sess.))); Kellogg, 762 F.Supp.2d at 704 (“Neither the Vermont courts nor the Vermont legislature have collapsed negligence actions into strict liability actions where products are involved.”).
I believe each of these principles is applicable in the case before us, and I believe both our law of products liability and our law of negligence dictate the brand defendants may be subject to liability here. As numerous authorities have noted, the causation problem the majority has identified in Mulcahy is irrelevant given the facts and claims before us. Instead, we must analyze the claims given our long-standing principles of negligence — a task I turn to now.
II. Duty.
We have often noted that while summary adjudication is rarely appropriate in negligence cases, the determination of whether a duty is owed under particular circumstances is a matter of law for the court’s determination. See, e.g., Hoyt v. Gutterz Bowl & Lounge L.L.C., 829 N.W.2d 772, 775 (Iowa 2013); Thompson, 774 N.W.2d at 834. In Thompson, we adopted the duty analysis of section 7 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, and we concluded an actor generally has a duty to exercise reasonable care when the actor’s conduct creates a risk of physical harm. Thompson, 774 N.W.2d at 835; see also Feld v. Borkowski, 790 N.W.2d 72, 75 (Iowa 2010) (“As a general rule, our law recognizes that every person owes a duty to exercise reasonable care to avoid causing injuries to others.”).
We explained that in most cases, a court need not concern itself with the existence or content of the duty, and should instead proceed to analysis of the remaining elements of negligence liability. Thompson, 774 N.W.2d at 835; see also Feld, 790 N.W.2d at 76. In exceptional cases, we noted, an actor’s general duty to exercise reasonable care might be displaced or modified based on countervailing policy considerations justifying limited or no lia *389 bility in certain classes of cases — but those policy reasons were not to depend on the specific facts of any given case. Thompson, 774 N.W.2d at 835. In detailing this analysis more recently, we have noted we may look to the comments and principles of the current Restatement, the comments and principles of prior Restatements, and our prior caselaw in determining whether policy considerations dictate departure from our general recognition of a duty to exercise reasonable care in particular broadly drawn classes of cases. See McCormick v. Nikkei & Assocs., Inc., 819 N.W.2d 368, 371-74 (Iowa 2012).
A. Applicable Duty Principles From Our Caselaw and the Restatements of the Law. The drafters of the Restatement (Third) have set forth several important duty principles to guide us in our analysis here. The drafters explain an actor’s business operations may provide a fertile source for natural risks or third-party misconduct that creates risks that would not have occurred in the absence of the business. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37 cmt. d, at 5 (2012). Section 19, they note, specifically sets forth the standard of care for scenarios where an actor’s conduct increases the risk of third-party conduct causing harm. Id. We adopted that reasoning in Hoyt, where we concluded the duty of care applies to all risks arising from a given course of conduct, even if also created in part by a third party’s conduct, regardless “whether innocent, negligent, or intentional.” Hoyt, 829 N.W.2d at 779. In cases where business operations provide a source of risk, the drafters note, “the actor’s conduct creates risks of its own and, therefore, is governed by the ordinary duty of reasonable care in [section] 7.” Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37 cmt. d, at 5.
The drafters also note section 315 of the Restatement (Second) of Torts has often led to pronouncements that “absent a special relationship an actor owes no duty to control third parties.” Id. Section 315, however, addressed only affirmative duties to control third parties — it had nothing to say about “the ordinary duty of reasonable care with regard to conduct that might provide an occasion for a third party to cause harm.” Id. The Restatement (Second) actually addressed that latter scenario in section 302B, the drafters explain, in providing for a duty of care when an actor’s conduct “ ‘has created or exposed the other to a recognizable high degree of risk of harm through such [third-party] misconduct.’ ” Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37, cmt. d, at 5 (quoting Restatement (Second) of Torts § 302B cmt. e, at 90). Thus, the drafters note, both the Restatement (Second) and the Restatement (Third) provide for liability when actors engage in conduct that increases the magnitude of natural or third-party risks. Id. § 37, cmt. d, at 4-5. Even when the actor and victim are complete strangers and have no relationship, the drafters explain, the basis for the ordinary duty of reasonable care under section 7 is conduct creating risk to another. Id. § 37 cmt. b, at 3; see also West v. Broderick & Bascom Rope Co., 197 N.W.2d 202, 209 (Iowa 1972) (noting Iowa courts have “extrieat[ed] themselves from the erroneous imposition of the privity requirement”). A relationship, in other words, does not typically define the line between duty and no duty — instead, the line is drawn by conduct creating risk to another. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37 cmt. b, at 3; see, e.g., Keller v. State, 475 N.W.2d 174, 179 (Iowa 1991) (“[Linking the existence of legal duty to a particular relationship between the parties is not an unwavering requirement for all *390 negligence torts.”); see also Chatman, 960 F.Supp.2d at 654 (“As a general rule, in the context of negligence claims a relationship is not necessary for a duty to exist.”); Gipson v. Kasey, 214 Ariz. 141, 150 P.3d 228, 232 (2007) (“A special or direct relationship, however, is not essential in order for there to be a duty of care.”).
Further, the Restatement (Third) devotes an entire section to conduct creating an ongoing risk of physical harm, in providing “[w]hen an actor’s prior conduct, even though not tortious, creates a continuing risk of physical harm of a type characteristic of the conduct, the actor has a duty to exercise reasonable care to prevent or minimize the harm.” Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 39, at 31. As the drafters make clear, the initial conduct need not be actionable or even tortious for a duty to arise under the section. Id. § 39 cmt. c, at 31. In addition, they explain that even in the rare case a court declines to apply the general section 7 duty we have recognized in our caselaw, an actor will nonetheless have an ongoing duty to use reasonable care to warn or otherwise mitigate risk under section 39. Id. § 39 cmt. d, at 33-34. Even if the actor does not know his or her conduct has created a risk of harm, the drafters point out, the duty provided in section 39 exists. Id. § 39 cmt. d, at 34. In that case, however, “[bjefore a breach of the duty occurs ... an objectively foreseeable risk of harm must exist,” and that question, the drafters note, “is a question of fact for the jury.” Id. § 39 cmt. d, at 34-35. The section 39 duty, the drafters explain, is justified both by an actor’s creation of a risk, even if nontortiously, and by “the absence of the pragmatic and autonomy explanations” for the no-duty rule set forth in section 37.[20] Id. § 39 cmt. c, at 32. We have recognized the principles expressed in section 39 for many years. See, e.g., Lovick, 588 N.W.2d at 696 (“Our decision today confirms the existence of a post-sale duty for manufacturers to warn.... ”); see also Mercer v. Pittway Corp., 616 N.W.2d 602, 623-24 (Iowa 2000) (“[T]he inquiry is whether a reasonable manufacturer knew or should have known of the danger, in light of the generally recognized and prevailing best scientific knowledge, yet failed to provide adequate warning to users or customers.”).
Section 552 of the Restatement (Second) of Torts provides additional insight. This section, setting forth requirements for the tort of negligent misrepresentation, provides that an actor supplying false information for the guidance of others may be liable for losses caused by justifiable reliance upon the information. See Restatement (Second) of Torts § 552, at 126-27. We have a long history of applying the section 552 principles in Iowa, and we have noted our caselaw ensures those liable are *391 in a position to weigh potential uses of the information against the potential magnitude and probability of loss if the information is inadequate or incorrect. See Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc., 783 N.W.2d 684, 691-92 (Iowa 2010).
As the drafters of the Restatement (Second) recognized long ago, “[w]hen there is a public duty to supply the information in question ... the maker of the negligent misrepresentation becomes subject to liability to any of the class of persons for whose benefit the duty is created.” Restatement (Second) of Torts § 552 cmt. ⅞ at 138. The rule, the drafters explained, applies to both public officers and private individuals or corporations required by law to file information for the benefit of the public. Id. § 552 cmt. k, at 139. In cases where the group to be protected by the filing requirement is a broad one, the drafters noted, a corporation might be liable to “any one who may reasonably be expected to rely on the information and suffer loss as a result.” Id. As an illustration of the principle, the drafters offered the following example:
A, a United States government food inspector, in the performance of his official duties, negligently stamps a quantity of B’s beef as “Grade A.” In fact the beef is of inferior quality. In reliance upon the stamps, C buys the beef from D, and suffers pecuniary loss as a result. A is subject to liability to C.
Restatement (Second) of Torts § 552 illus. 18, at 139; see also id. § 552 cmt. i, at 136 (“When a misrepresentation creates a risk of physical harm to the person, land or chattels of others, the liability of the maker extends, under the rules stated in §§ 310 and 311, to any person to whom he should expect physical harm to result through action taken in reliance upon it.”).
We have applied reasoning presaging the drafters’ section 552 analysis for more than a century here in Iowa. See, e.g., Warfield v. Clark, 118 Iowa 69, 72-73, 91 N.W. 833, 835 (1902) (“If the defendant in fact falsely reported the financial condition of his company for the purpose of deceiving the public in relation to its responsibility as an insurer, it seems clear to us that we should not say as a matter of law that he only intended to wrong that particular class, and that those dealing in its stock were not his intended victims; for he knew that stock in such companies was often bought and sold, and that reliance might be placed upon his sworn statement by those dealing therein.”). As a general proposition, we have long recognized and continue to recognize an actor may be liable to third parties who reasonably rely upon information prepared by the actor where the actor has reason to believe the information will be relied upon by the third party. See, e.g., Van Sickle, 783 N.W.2d at 691; Ryan v. Kanne, 170 N.W.2d 395, 403 (Iowa 1969). The point of this discussion, of course, is not that a brand defendant must owe a duty to a consumer under section 552; the point, instead, is the tort of negligent misrepresentation is another illustration of the principle that an actor may create a risk of harm and thus owe a duty to another even in the absence of having sold or manufactured a product. Accordingly, the majority misses the mark in concluding the brand defendants owe no duty to Huck because they never sold her a product.
Similarly, just as we have applied the duty principles of the Restatement (Second) for many years, we have also applied the duty principles of the Restatement (Third) both before and after our adoption of the section 7 general duty in Thompson. See, e.g., Bohan v. Hogan, 567 N.W.2d 234, 237 (Iowa 1997) (“An act or omission may be negligent if the actor realizes or should *392 realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person.” (quoting Restatement (Second) of Torts § 302A, at 86)); Fíala v. Rains, 519 N.W.2d 386, 389 (Iowa 1994) (same); see also Mitchell v. Cedar Rapids Cmty. Sch. Dist., 832 N.W.2d 689, 702 (Iowa 2013) (“[W]e have adopted the duty principles of the Restatement (Third)....”); Hoyt, 829 N.W.2d at 775-76, 776 n.4 (examining duty principles of Restatement (Third) sections 7, 19, 37, and 40).
Our analysis in Bohan is particularly illustrative of this point. See Bohan, 567 N.W.2d at 235-37. In Bohan, a group of investors brought negligence claims for losses suffered as a result of a deception by a securities broker. Id. at 235. The broker had secured funds from the investors by delivering them fictitious certificates of deposit purporting to have been issued by a Chicago bank. Id. At issue in the case were not the claims of the investors against the broker, but the investors’ claims against a small Iowa printer who had printed the certificates, without knowledge of the deception, at the broker’s request. Id. Despite the printer’s lack of knowing involvement in the broker’s scheme, and despite the lack of any special relationship between the printer and the investors, we reasoned the investors had stated a claim of the printer’s “own active negligence in furnishing an instrumentality that caused harm to these claimants.” Id. at 236. With the aid of the principles set forth in Restatement (Second) section 302B, and later in Restatement (Third) sections 7, 19, and 37, we concluded a duty to exercise reasonable care exists when an actor’s conduct creates a risk of harm, even if the risk involves the negligent or reckless conduct of another. See id. at 236-37. No special relationship, we explained, was required between the parties to give rise to the duty. Id. at 237. We were thus “unable to conclude that there could be no set of facts proved that would support a claim of actionable negligence on the part of’ the printer. Id. at 236.
Our cases following Thompson have applied the same principles. In Feld, we explained all actors owe a duty to exercise reasonable care to avoid causing injury to others, and the actor may be liable if the injury caused by the actor’s conduct resulted from the risks rendering the actor’s conduct negligent. Feld, 790 N.W.2d at 75-76; see also Restatement (Second) of Torts § 284(a), at 19 (providing negligent conduct includes acts “which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another”). We noted our long-standing contact-sports exception to the general duty to exercise reasonable care, and noted various policy reasons supported our modification of the general duty in the realm of slow-pitch high school softball. Feld, 790 N.W.2d at 76-78. We retained the general duty for that class of cases, but modified it such that actors in slow-pitch softball games now have a duty to avoid reckless disregard for the safety of others. Id. Similarly, in McCormick, we noted we had affirmed our law recognizing the general duty in Thompson and explained an actor generally has a duty to exercise reasonable care when the actor’s conduct creates a risk of physical harm. McCormick, 819 N.W.2d at 371, 374. Concluding the subcontractor there owed no duty to a property owner’s employee who had been electrocuted by a switchgear, we explained the subcontractor had not “createfd] a ‘risk of physical harm,’ ” and thus our general negligence principles and the principles of the Restatement (Third) would not support liability. Id. at 374-75 (quoting Restatement (Third) of Torts: Liab. for Physical & *393 Emotional Harm § 7(a), at 77). Finally, in Hoyt, we reiterated our long-standing rule that an actor has a duty to exercise reasonable care when his or her conduct creates a risk of harm, while explaining no-duty rulings should be limited to exceptional classes of cases invoking specifically articulated countervailing policy considerations. Hoyt, 829 N.W.2d at 775.
Notably, we never invoked the duty question at all in Bredberg or Mulcahy. See Bredberg, 551 N.W.2d at 328-29; Mul-cahy, 386 N.W.2d at 69-76. The majority appears to agree Mulcahy had nothing to say about duty — the court there was concerned with the majority’s proposed “product-identification causation requirement,” because the existence of a duty was never in question. The duty principle most prominently applicable in both Mulcahy and Bredberg was surely the long-standing strict products liability principle that “the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it.” Restatement (Second) of Torts § 402A cmt. c, at 349; see also Bredberg, 551 N.W.2d at 326-27 (citing section 402A); Mulcahy, 386 N.W.2d at 70 (same); see also Moore v. Vanderloo, 386 N.W.2d 108, 117 (Iowa 1986) (“A drug manufacturer may be held liable for a defective product in a strict liability action.”).
That strict liability principle, however, was not the only principle resolving the duty question in those cases or any other products liability cases, because as we have long noted, our longstanding general duty of reasonable care is also applicable in these cases. See, e.g., Osborn, 290 N.W.2d at 901 (citing cases examining “defective design of a product or project as negligence”); see also Lovick, 588 N.W.2d at 696 (confirming duty to exercise reasonable care in post-sale warning); Cooley v. Quick Supply Co., 221 N.W.2d 763, 771 (Iowa 1974) (explaining question of whom should receive warning is “to be decided [by a jury] by standards of reasonable care.”); Hawkeye, 174 N.W.2d at 685; Bengford v. Carlem Corp., 156 N.W.2d 855, 864 (Iowa 1968) (“Applying these rules to the evidence in this case it seems clear a jury could find defendant, Ford Motor Company, failed to follow these recognized standards of care and that as a proximate cause thereof plaintiff was injured.”); Wagner v. Larson, 257 Iowa 1202, 1222, 136 N.W.2d 312, 324 (1965) (“If a manufacturer does everything necessary to make the machine function properly ... then the manufacturer has satisfied the law’s demands.” (quoting Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802, 804 (1950))). As we have more recently explained, affirmative duties created as a result of a special relationship or undertaking, like the strict liability duty, may often overlap with the general duty, but the existence of an affirmative duty does not displace the general duty. See, e.g., Hoyt, 829 N.W.2d at 775-76; see also Hawkeye, 174 N.W.2d at 685; Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 6 cmt. e, at 68-69 (explaining special rules of law, “such as various rules of strict liability,” may impose liability even in the absence of the general duty, and noting Restatement (Third) of Torts: Products Liability details those strict liability rules); id. § 40 cmt. c, at 40 (explaining relationship between general and affirmative duties); id. § 40 cmt. h, at 42-43 (same).
B. Application of Our Duty Principles. Applying our duty principles as we always have, the existence of a duty should not be controversial here. The brand defendants created risks in designing and manufacturing Reglan®, and created risks in developing its warning, which, by virtue of federal law, generics *394 were required to mimic. Those risks gave rise to duties. These are not novel propositions in our caselaw. See, e.g., Cooley, 221 N.W.2d at 771 (requiring “reasonable assurance that the information will reach those whose safety depends upon then-having it” (internal quotation marks omitted)); West, 197 N.W.2d at 209 (noting we recognize a duty of reasonable care “as to any product which [an actor] can reasonably expect to be dangerous if he is negligent in its manufacture or sale”); Tice v. Wilmington Chem. Corp., 259 Iowa 27, 48, 141 N.W.2d 616, 626 (1966) (“When a manufacturer, distributor, producer or retailer markets a product with representations as to its condition there should most certainly be imposed a strict accountability where the ultimate consumer relies upon those representations and suffers injury....”); see also PLTVA, Inc. v. Mensing, 564 U.S. -, -, 131 S.Ct. 2567, 2585-86, 180 L.Ed.2d 580, 600-01 (2011) (Sotomayor, J., dissenting) (noting FDA requires drug companies “ ‘to seek to revise their labeling and provide FDA with supporting information about risks’ ” and explaining it is “undisputed” that drug companies “have a duty under federal law to monitor the safety of their products”); Restatement (Third) of Torts: Prods. Liab. § 6(c), at 145 (establishing duty of care to balance risks and benefits of prescription drugs with respect to design); id. § 6(d), at 145 (establishing duty of care to balance risks and benefits of prescription drugs with respect to instruction and warning); cf. Lamb v. Manitowoc Co., 570 N.W.2d 65, 68 (Iowa 1997) (“A duty to warn exists when a party reasonably foresee[s] a danger of injury or damage to one less knowledgeable unless an adequate warning is given.” (Internal quotation marks omitted.)). Neither the majority nor the parties have suggested we depart from our longstanding recognition of both general and special duties when an actor’s conduct creates a risk of physical harm, and I believe our recognition of those duties settles the question here. See Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7, at 77; see also Hoyt, 829 N.W.2d at 776-77; Feld, 790 N.W.2d at 75-76; Thompson, 774 N.W.2d at 835; Restatement (Second) of Torts § 327, at 146 (“One who knows or has reason to know that a third person ... is ready to give to another aid necessary to prevent physical harm to him, and negligently prevents or disables the third person from giving such aid, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving.”). Whether countervailing policy considerations may modify those duties is a separate question, and a question the parties do not address directly, but I will analyze it in turn.
Before tackling that question, however, I note even application of a relation-based conception of duty would establish duties on behalf of the brands, because federal law establishes the brands’ responsibility for both the design of the drug and the warning in question here. See, e.g., Dolin, 2014 WL 804458, at *4 (explaining brand “was responsible for” generic’s “design and warning label”); see also Mulcahy, 386 N.W.2d at 70 (explaining liability may attach when actor “was in some way responsible for the particular product that caused the injury”); Lance, 85 A.3d at 453 n.24 (explaining “federal law also imposes post-marketing duties on pharmaceutical companies, including the obligation to ‘ensure] that [their] warnings remain adequate as long as the drug is on the market’”). With respect to design, federal law requires the generic version’s chemical equivalence to the approved brand-name drug: it must have the same “active ingredient” or “active ingredients,” “route of *395 administration,” “dosage form,” and “strength” as its brand-name counterpart. 21 U.S.C. § 355(j)(2)(A)(ii)-(iii) (2012). The generic must also be “bioequivalent” and have the same “rate and extent of absorption” as the branded drug. Id. § 355(j‘)(2)(A)(iv), (8)(B). With respect to the warning, as the majority explains, the FDA must approve the accuracy and adequacy of the brands’ labeling, and generic drug manufacturers are required, by law, to show “the labeling proposed for the new drug is the same as the labeling approved for the [approved brand-name] drug.” Id. § 355(a), (b)(1), (d), (2)(A)(v). And, after initial approval of the new drug application, a brand manufacturer may update its label to “add or strengthen a contraindication, warning, precaution, or adverse reaction” or to “add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product” by filing an application with the FDA, but it need not wait for FDA approval, and the generic manufacturers are subject to an ongoing obligation of sameness. 21 C.F.R. § 314.70(c)(6)(iii)(A), (C) (2008); id. §§ 314.94(a)(8), 127(a)(7); Abbreviated New Drug Application Regulations, 57 Fed.Reg. 17950-01, 17961 (Apr. 28, 1992) (“[T]he [generic drug’s] labeling must be the same as the listed drug product’s labeling because the listed drug product is the basis for [generic drug] approval.”). Moreover, every state now has a drug substitution law, which requires pharmacists filling prescriptions under most circumstances to substitute generic alternatives for branded drugs when available. Dolin, 2014 WL 804458, at *5 n.5; see also, e.g., Iowa Code § 155A.32 (2013).
There can be no doubt, then, the brands understood other manufacturers were producing generic versions of the drug, those versions were required by law to use the brands’ design and warning label, consumers were purchasing those versions, and the brands had the ability both initially and upon later investigation to remedy any defects in the drug’s design or warning. Dolin, 2014 WL 804458, at *5-6; see also Henkel v. R & S Bottling Co., 323 N.W.2d 185, 192 (Iowa 1982) (“A manufacturer must anticipate the nature of the environment in which the product [will] be used and [design against] the foreseeable risk attending the product’s use in that setting.”). A mountain of authority from other jurisdictions supports recognition of a duty on the part of a brand manufacturer given these considerations. See Dolin, 2014 WL 804458, at *6 (“[T]hese parties stood in a relationship to one another that, while clearly not ‘direct,’ was sufficient for the law to impose a duty of reasonable conduct upon GSK for the benefit of Plaintiff.”); Schedin, 808 F.Supp.2d at 1136 (“[T]he jury had sufficient evidence from which to conclude [the brand] breached its duty to warn and that this breach caused [the generic consumer’s] injuries.”); see also Chatman, 960 F.Supp.2d at 655 (“In an affirmative misrepresentation case, even though a defendant does not have a relationship with the plaintiff, it is still possible for the defendant to be liable for causing the plaintiffs physical injury if the plaintiff reasonably relies on false information provided by the defendant.”); Kellogg, 762 F.Supp.2d at 706 (“To recognize that a brand name drug manufacturer owes a duty to use reasonable care to avoid causing injury to consumers of the generic bioequivalents of its drugs does not ‘recognize a new cause of action or enlarge an existing one’.... ”); Easter, 2004 WL 3104610, at *9 (“Lilly’s design of and intimate knowledge about thimerosal also gives rise to a duty to inform users of hazards associated with the use of thimer-osal.”); Weeks, — So.3d at -, 2013 WL 135753, at *19 (“[I]t is not fundamentally unfair to hold the brand-name manu *396 facturer liable for warnings on a product it did not produce because the manufacturing process is irrelevant to misrepresentation theories based, not on manufacturing defects in the product itself, but on information and warning deficiencies, when those alleged misrepresentations were drafted by the brand-name manufacturer and merely repeated by the generic manufacturer.”); Conte, 85 Cal.Rptr.3d at 315 (“We hold that Wyeth’s duty of care in disseminating product information extends to those patients who are injured by generic metoclopramide as a result of prescriptions written in reliance on Wyeth’s product information for Reglan.”); Lance, 85 A.3d at 457 (“Wyeth — as the proponent of a contraction of existing tort law — has failed to persuade us that federal regulatory involvement warrants a departure from Pennsylvania’s system of civil redress, where there is a demonstrated lack of due care in the face of an existing duty.”); Clark, 2008 WL 7668730, 2008 Phila. Ct. Com. PI. LEXIS 74, at *28-32 (concluding brand manufacturer owed duty to generic purchaser).
Accordingly, I believe both relation-based and risk-based conceptions of duty compel our recognition of a duty here.
C. Countervailing Policy Considerations. As noted, we have recognized categorical principles or policy considerations may sometimes provide a basis for modifying or eliminating our longstanding general duty of care for certain broadly drawn classes of actors. See, e.g., Feld, 790 N.W.2d at 76. In the context of prescription drugs, the drafters of the Restatement (Third) have explained the general trend has not been to disembowel the longstanding duty to warn — instead, courts have typically recognized the duty, and modified it slightly such that the duty is generally to warn and provide instructions to the prescribing physician. See Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7 cmt. i, at 82. Of course, as the drafters recognize, even that minor modification is subject to important exception, as courts have generally recognized the duty to warn extends even to patients when a drug company “knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm.” See Restatement (Third) of Torts: Prods. Liab. § 6(d)(2), at 145. Neither the parties nor the majority has advanced a suggestion we discard duties to warn generally in the pharmaceutical industry, and I do not believe any court from any jurisdiction or any policy principle would support that approach.
I do not discount the impact of litigation on the pharmaceutical industry. I would note, however, we have been presented with very little information for purposes of undertaking any reasoned comparison of that impact with the substantial social impact of filleting our longstanding law of fault-based liability in Iowa. We do know the brands have been granted significant advantages in exchange for the burdens of responsibility they bear for drug design and labeling. They are entitled to an initial period of government-protected monopoly privileges in the form of patent protection. See 35 U.S.C. § 154. They are entitled to an extension of those monopoly privileges when generic versions of their drugs receive FDA approval. See id. § 156 (patent-term extension); Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585 (codified in relevant part at 21 U.S.C. § 355 (1988)) (pairing generic approval with patent-term extension). We know they enjoy “the fiscal rewards of name-brand recognition and the commensurate ability to charge a higher price ..., even after [their] exclusive marketing period expires.” Conte, 85 Cal.Rptr.3d at 317. Moreover, we know our recognition of a *397 duty does not subject the brands to any new obligation here — as all parties involved concede, the brands are already subject to these obligations with respect to the branded versions, and the design and warning must remain the same for the generic versions.
Perhaps most importantly, we know Congress weighed each of these considerations in enacting the Hatch-Waxman amendments to the FDCA, and notably, made no reference to elimination of the brands’ fault-based legal obligations. See Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585 (1984). Indeed, I believe both courts and legislatures have typically regarded the tort system as providing powerful incentives to engage in responsible, reasonable behavior to promote safety in numerous industries, including the pharmaceutical industry. See generally Wyeth v. Levine, 555 U.S. 555, 578, 129 S.Ct. 1187, 1202, 173 L.Ed.2d 51, 68-69 (2009). Our general assembly codified that recognition shortly after the Hatch-Waxman amendments, in noting our general tort duties are applicable even in products liability actions, to actors well outside the direct stream of product distribution in both negligence and strict liability. See, e.g., Iowa Code § 668.12 (1987) (“Nothing [contained in subsection providing state-of-the-art defense] shall diminish the duty of an assembler, designer, supplier of specifications, distributor, manufacturer, or seller to warn concerning subsequently acquired knowledge of a defect or dangerous condition that would render the product unreasonably dangerous for its foreseeable use or diminish the liability for failure to so warn.”); see also Lovick, 588 N.W.2d at 693 (explaining “section 668.12 clearly established our legislature’s understanding of the duty”).
Furthermore, as I have noted, the Supreme Court has rejected the notion that negligence claims against brand defendants for failure to warn based on state tort law are preempted by federal law. See Levine, 555 U.S. at 581, 129 S.Ct. at 1204, 173 L.Ed.2d at 70. Yet, the majority quotes at length from an article authored by Professor Epstein asserting the Supreme Court got it wrong on preemption. Repurposing Epstein’s rejected policy arguments favoring preemption, the majority advances them in favor of a no-duty rule in this case. As they failed in furtherance of preemption, they must come up short here as well.
Epstein would place great reliance on the expertise of the FDA in assessing the risks posed by medications to consumers, allocating the duty to warn, and regulating the content of warnings. But there is another side of the story. As the Supreme Court noted in Levine, the resources of the FDA are limited while the volume of regulated medications is vast. Levine, 555 U.S. at 578-79, 129 S.Ct. at 1202, 173 L.Ed.2d at 68 (noting the FDA has limited resources with which to regulate 11,000 medications). This reality has prompted a former FDA commissioner, along with a noted administrative law authority, to express reservations about the agency’s ability to effectively monitor the safety of the consuming public, and to affirm the ameliorative purposes served by state tort law:
Our second concern is that the FDA’s pro-preemption arguments are based on what we see as an unrealistic assessment of the agency’s practical ability— once it has approved the marketing of a drug — to detect unforeseen adverse effects of the drug and to take prompt and effective remedial action. After all, there are 11,000 FDA-regulated drugs on the market (including both prescription and over-the-counter drugs), with nearly one hundred more approved each *398 year. The reality is that the FDA does not have the resources to perform the Herculean task of monitoring comprehensively the performance of every drug on the market. Recent regulatory failures, such as the agency’s ineffectual response to Vioxx, have demonstrated the FDA’s shortcomings in this regard. Given the FDA’s inability to police drug safety effectively on its own, we question the wisdom of the FDA’s efforts to restrict or eliminate the complimentary discipline placed on the market by failure-to-warn litigation.
[[Image here]]
The information-gathering tools lawyers have in litigation are, by any measure, more extensive than the FDA’s.
[[Image here]]
Statutory gaps in the FDA’s authority to gather information, especially post-approval, hamstring its ability to ensure the safety of drugs on the market. The FDA Amendments Act may help close those gaps somewhat, but they remain substantial.... The benefits of this litigation should not be discarded lightly, and, as we have said, we see no benefit to the FDA or the public in finding failure-to-warn litigation pre-empted.
David A. Kessler & David C. Vladeck, A Critical Examination of the FDA’s Efforts to Preempt Failure-to-Wam Claims, 96 Geo. L.J. 461, 465, 492, 495 (2008). If the reasons advanced by Kessler and Vla-deck — and by the Supreme Court in Levine — for rejecting preemption of failure-to-warn claims are to be given any practical recognition, they must apply with equal, if not greater, force to the majority’s contention the courthouse doors should be closed to consumers like Huck by a court-made no-duty rule. See Levine, 555 U.S. at 592, 129 S.Ct. at 1210, 173 L.Ed.2d at 77 (Thomas, J., concurring) (“Initial approval of a label amounts to a finding by the FDA that the label is safe for purposes of gaining federal approval to market the drug. It does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or as in this case, the application of state law.”).
It is instructive, in my view, that Congress has not chosen to preempt failure-to-warn cases brought against brands. The policy choice against preemption maintained by Congress during the more than seven decades of the FDA’s existence evidences that the legislative branch values the salutary effects of tort law in this area. Congress clearly knows how to prescribe preemption, as it did so in the medical device field in 1976. See 21 U.S.C. § S60k(a) (2012); Levine, 555 U.S. at 574, 129 S.Ct. at 1200, 173 L.Ed.2d at 66. The choice by Congress in eschewing preemption for brand pharmaceuticals reveals faith in the beneficial impact of the civil justice system in augmenting the protections afforded by the FDA. See Levine, 555 U.S. at 574, 129 S.Ct. at 1200, 173 L.Ed.2d at 66 (“If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express preemption provision at some point during the FDCA’s 70-year history.”); see also id. 555 U.S. at 574, 129 S.Ct. at 1199-1200, 173 L.Ed.2d at 65-66 (“Congress did not provide a federal remedy for consumers harmed by unsafe or ineffective drugs in the 1938 statute or in any subsequent amendment. Evidently, it determined that widely available state rights of action provided appropriate relief for injured consumers. It may also have recognized that state-law remedies further consumer protection by motivating manufacturers to produce safe and effective drugs and to give adequate warnings.” (Footnote omitted.)); Rostron, 60 Duke L.J. at 1191 (“The FDA’s regulatory oversight repeatedly has proven insufficient to prevent *399 unreasonably dangerous drugs from reaching consumers. Tort law provides vital incentives for drug makers to act with appropriate care. Courts should apply tort law in a manner that encourages drug companies to continue producing innovative products but to act reasonably to ensure that their products are safe and accompanied by adequate warnings and accurate information. Striking the right balance is a challenge, but it is one that courts must continue striving to meet. These issues can quite literally be matters of life and death.” (Footnote omitted.)); cf. Allison Stoddart, Missing after Mensing: A Remedy for Generic Drug Consumers, 53 B.C. L.Rev.1967, 1998 (2012) (“The tort system incentivizes manufacturers to strengthen warnings by allowing tort claims against manufacturers when the probability of harm from an inadequate warning is greater than the burden of enhancing the warning — that is, when the manufacturer is negligent.”).
The majority’s claim that the pharmaceutical industry will be substantially harmed by a rule imposing a duty on the brands, who controlled the content of the warning PLIVA was legally required to use, is, in my view, speculative and overblown. See Steven Garber, Economic Effects of Product Liability and Other Litigation Involving the Safety and Effectiveness of Pharmaceuticals, Rand Institute for Civil Justice, at xv (2013), available at www.rand.org/pubs/ monographsAngl259.html (suggesting policymakers should be “wary of broad claims about economic effects of pharmaceutical liability, including generalizations based on anecdotes or examples”).[21] The safety-based regulations promulgated by the FDA can comfortably coexist with the brands’ duty to exercise reasonable care in warning consumers of grave health risks attending the use of pharmaceuticals.[22] See, e.g., Levine, 555 U.S. at 593, 129 S.Ct. at 1211, 173 L.Ed.2d at 78 *400 (Thomas, J., concurring) (“The federal statute and regulations neither prohibited the stronger warning label required by the state judgment, nor insulated Wyeth from the risk of state-law liability.”). As Robert Rabin has explained,
Tort duties do not “require” anything other than the payment of damages. If tort liability does lead a defendant to a private assessment in favor of greater future precautionary measures, then tort, of course, has had a regulatory effect. But tort itself dictates no particular change in a losing defendant’s conduct.
[[Image here]]
[Tjhere is no inexorable principle that productivity gains from uniform national health and safety standards — a frequently invoked rationale for preemption — should be borne by injury victims in cases of residual harm. Moreover, once again, it is critical to underscore the dynamics of tort. Liability does not entail enforced departure from regulatory standards; it only compels payment of damage awards.
[[Image here]]
If the tort claim rests on an assertion that substantial post-approval new evidence of risk has come to light, and has neither been incorporated into a revised warning, nor rejected by the agency as insubstantial, the foundational risk/benefit analysis on which agency certification was based is inapposite. Hence, the tort claim is not an effort to revisit and supersede the regulatory approval process.
[[Image here]]
In proposing a framework for addressing these tensions, based on focused examination of whether the agency directive is grounded in the same evidence-based risk/benefit inquiry as the tort process would entail, I join those commentators who seek to forge a path that recognizes the distinct benefits that both regulation and tort have to offer.
Robert L. Rabin, Territorial Claims in the Domain of Accidental Harm: Conflicting Conceptions of Tort Preemption, 74 Brook. L.Rev. 987, 991, 993, 1002, 1009 (2009) (emphasis added).
Given these considerations, and taking account of the vast range of information that must be weighed when balancing the interests of the pharmaceutical industry and those of consumers, I do not believe we are adequately equipped to craft a bright-line no-duty rule here. I would leave that policymaking to our general assembly, which has continued to recognize duties in this realm. I would therefore continue to hew to the long-standing and widespread recognition of the brands’ general and affirmative duties here.
III. Factual Causation.
In addition to establishing the existence of a duty or duties, we have often explained in both products liability and traditional negligence cases the plaintiff “must establish a causal relationship between the alleged negligence and injury.” Lovick, 588 N.W.2d at 700 (products liability); accord Thompson, 774 N.W.2d at 836-39 (negligence). In the context of failure to warn claims, we have noted factual causation is established by demonstrating “a warning would have altered the plaintiffs conduct so as to avoid injury.” Lovick, 588 N.W.2d at 700. More generally, as the drafters of the Restatement (Third) have provided, “[cjonduct is a factual cause of harm when the harm would not have occurred absent the conduct.” Restatement *401 (Third) of Torts: Liab. for Physical & Emotional Harm § 26, at 346; accord Thompson, 774 N.W.2d at 837-39 (adopting Restatement (Third) factual causation and scope of liability principles); see also Asher v. OB-Gyn Specialists, P.C., 846 N.W.2d 492, 500 (Iowa 2014). This is tort law’s familiar “but-for” test, and both the First and Second Restatements of Torts endorsed this standard in providing “the harm would not have occurred had the actor not been negligent.” See, e.g., Restatement (Second) of Torts § 431 cmt. a, at 429; see also Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 26 cmt. b, at 347.
Here, as the majority explains, Dr. Gya-no relies upon information published by the brands — for purposes of covering both branded versions of drugs and their generic counterparts — in the Physician’s Desk Reference in making prescription decisions generally, and she relied on this information in 2004 to prescribe branded Reglan for Huck. Dr. Gyano has explained the risk-benefit analysis she uses in making prescription decisions has changed as a result of her access to the brands’ updated information and labeling. She now supplements the conversation she typically has with patients with this risk-benefit information before making prescription decisions. Further, she has noted she would have modified her treatment conversations and decisions in the same way had she received this information back in 2004, and the information would have had the same impact. Finally, Dr. Gyano and Huck have explained had this information been available sooner, and had they discussed the implications back then, Huck would never have taken metoclopramide, and would never have developed tardive dys-kinesia. Applying our principles of factual causation in straightforward fashion, we may safely conclude Huck has advanced evidence sufficient to allow a jury to find her harm would not have occurred had the brands not allegedly failed to satisfy their obligation of reasonable care, and similarly, she has advanced evidence sufficient to allow a jury to find a warning would have altered her conduct such that she would have avoided injury. See Lovick, 588 N.W.2d at 700 (“[C]aus[ation] can be established by showing a warning would have altered the plaintiffs conduct so as to avoid injury.”).
Although that analysis resolves the factual causation question simply and completely, I think it prudent to point out several general principles relevant to the factual causation analysis in both products liability cases in general and in the case we actually confront here. Dolin, 2014 WL 804458, at *7 (noting courts have often “conflate[d] two facially similar, but fundamentally distinct, tort liability problems”); Rostron, 60 Duke L.J. at 1164 (“[Cjourts have repeatedly made the same mistake, dwelling on the irrelevant concept of liability being imposed on multiple manufacturers because of uncertainty about who made a product and conflating that concept with the separate and distinct issue of whether a manufacturer can be hable for wrongdoing other than making and selling the product the plaintiff received.”).
As I have already noted, the factual scenario we confront here is not the one we examined in Mulcahy, where we could not identify the actor allegedly responsible for harm. Instead, we face here a scenario where an injury occurred in connection with a given product and the plaintiff can demonstrate tortious conduct by someone other than the product’s manufacturer had a causal role in producing the injury. This latter scenario is not a novel one in the field of products liability law. See generally Madden & Owen on Products Liability § 19:4, at 370-78 (3d ed.2000) (collecting cases); Melissa Evans Bush, Products Li *402 ability and Intellectual Property Li-censors, 22 Wm. Mitchell L.Rev. 299, 311— 14 (2000) (collecting cases).
The scenario arises in numerous ways, and in each, courts have not hesitated in finding factual causation. Where an organization in the business of testing products and affixing labels certifying the results of its testing is negligent in its labeling, for example, courts have concluded the tester’s negligence may be a factual cause of injuries when these products fail to perform in accordance with the labeling. See, e.g., Hempstead v. Gen. Fire Extinguisher Corp., 269 F.Supp. 109, 118 (D.Del.1967) (“If plaintiff succeeds in proving his charge that Underwriters was negligent in approving the design of a fire extinguisher which was imminently dangerous, and that plaintiffs injury was a result thereof, Underwriters must respond in damages.”). When a publisher is in the business of placing an endorsement or seal of approval on products, and fails to exercise ordinary care in approving a particular product, courts have concluded the publisher’s conduct may be a factual cause of damages when the product fails to perform in accordance with the publisher’s representation. See, e.g., Hanberry v. Hearst Corp., 276 Cal.App.2d 680, 81 Cal.Rptr. 519, 522 (1969) (“[I]ts seal and certification tend to induce and encourage consumers to purchase products advertised in the magazine and which bear that seal and certification.”). Likewise, courts have concluded nonman-ufacturing seed certifiers constitute a nontrivial link “in the chain of distribution which [places] a [product] in the stream of commerce,” and thus those certifiers may play a causal role in any damage suffered by third parties relying on those certifications. Rottinghaus v. Howell, 35 Wash.App. 99, 666 P.2d 899, 907 (1983) (“MPIA’s conduct in certifying the defective seed, issuing a blue tag stating such and representing the quality of the seed in the 1977 directory created an issue for the jury as to whether defendant was liable for negligence and negligent misrepresentation.”). Similarly, a trade association or other organization setting insufficient safety standards for a product may factually cause harms flowing from the plaintiffs use of the product. See Meneely v. S.R. Smith, Inc., 101 Wash.App. 845, 5 P.3d 49, 57 (2000) (“We hold the evidence and the reasonable inferences therefrom support the jury’s findings that NSPI negligently caused Mr. Meneefys injuries....”).
Perhaps more to the point, we recognized in both Schiltz and McCarthy designers and suppliers of specifications may have a causal role in damages resulting from the failure of structures built according to those designs or specifications. See Schiltz, 228 N.W.2d at 17; McCarthy, 199 N.W.2d at 367-68. In Schiltz, we explained the plaintiff had advanced substantial evidence an engineering firm had negligently designed protective dikes for a sewage treatment facility and substantial evidence the negligence was a factual and legal cause — using our old tort terminology — of the plaintiffs damage. Schiltz, 228 N.W.2d at 18. Similarly, in McCarthy, we recognized an architect’s negligence in supplying plans and specifications for the construction of a school might constitute the factual cause of “improper collection and discharge of surface waters upon” a plaintiffs adjacent property. McCarthy, 199 N.W.2d at 367.
In addition to those propositions, I note products liability cases have never displaced our age-old torts principle that “an intervening act will not relieve a negligent defendant of liability if that act or force was a normal consequence of the defendant’s conduct or was reasonably foresee *403 able by that defendant.” Iowa Elec. Light & Power Co. v. Gen. Elec. Co., 352 N.W.2d 231, 235 (Iowa 1984); see also, e.g., Rossell v. Volkswagen of Am., 147 Ariz. 160, 709 P.2d 517, 526 (1985) (explaining “an intervening force becomes a superseding cause only when its operation was both unforeseeable and when with the benefit of ‘hindsight’ it may be described as abnormal or extraordinary” and applying rule in case of negligent placement of car battery); Larson Mach., Inc. v. Wallace, 268 Ark. 192, 600 S.W.2d 1, 9 (1980) (explaining “[t]he mere fact that other causes intervene between the original act of negligence and the injury for which recovery is sought is not sufficient to relieve the original actor of liability, if the injury is the natural and probable consequence of the original negligent act or omission and is such as might reasonably have been foreseen” and applying rule in ease of fertilizer spreader); Weyerhaeuser, 620 N.W.2d at 831 (“[T]he fire and resulting explosion were ... foreseeable intervening causes [of product’s defect] that did not supersede [defendant’s responsibility.”); Zacher v. Budd Co., 396 N.W.2d 122, 135 (S.D.1986) (explaining “even if a plaintiff is assumed contributorily negligent, whether that intervening force supersedes the defendant’s negligence is for the jury to decide” and applying rule in case of wheel explosion).
In short, the universe of imaginable scenarios in which an actor who has not manufactured or sold a product may nevertheless both cause and be liable for damages caused is enormous. The majority’s proposed “product-identification causation requirement” does no work to address the vast majority of these scenarios. See Bo-lin, 2014 WL 804458, at *8 (“Taken out of context, language in product identification cases ... may well appear to support GSK’s argument. In truth, the principles for which that line of cases stands are inapposite here.”). The majority’s invocation of the requirement here improvidently forsakes our clear and easily applied principles of factual causation. I would instead apply our traditional principles of factual causation in this case and conclude Huck has advanced evidence sufficient to allow a jury to find the brands’ alleged negligence was a but-for cause of the harm she has suffered here. I would therefore reverse the district court’s entry of summary judgment on Huck’s claims with respect to the brands and remand for trial.
WIGGINS and APPEL, JJ., join this concurrence in part and dissent in part.

. I will continue to refer to the analysis in Part III.B of the opinion by Justice Waterman as the “majority” for ease of reference only. As Chief Justice Cady’s special concurrence makes clear, the analysis in Part III.B of Justice Waterman’s opinion has the support of three justices, while Chief Justice Cady has concurred in the result only.

. Our failure to address the theories of design defect and failure to warn might be attributable to the fact the DES manufacturers were manufacturers, and to the fact we had not often distinguished those claims from claims for manufacturing defect at that point. See Mulcahy, 386 N.W.2d at 69-70.

. Section 37 of the Restatement (Third) provides the standard autonomy-based no-duty rule: "An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable.” Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37, at 2. The most common justification for this rule, the drafters note, "relies on the liberal tradition of individual freedom and autonomy” and places limits on "requiring affirmative conduct.” Id. § 37 cmt. e, at 5. Tensions between the section 37 justification and our common "values about humanitarian conduct” is reflected in the numerous exceptions to the rule elsewhere in the Restatement. Id. § 37 cmt. e, at 6. The section 37 rule also has other less common pragmatic justifications, the drafters explain, such as the concern that an affirmative duty to aid others in peril might be confused with a general duty of self-sacrifice. Id. § 37 cmt. e, at 5-6. As the drafters note, the rule has no application in any case where "the entirety of the actor’s conduct ... [has] created a risk of harm.” Id. § 37 cmt. c, at 3.

. Although interests advocating restriction of tort liability contend certain products have been either withdrawn or withheld from the market because of the costs associated with the civil justice system, there is scarce direct empirical evidence supporting these contentions. Even if we were to credit the contentions, however, our analysis would require examination of additional crucial questions: Were the products bad or dangerous? Was their withdrawal from the market in the public interest? See, e.g., Gary T. Schwartz, Reality in the Economic Analysis of Tort Law: Does Tort Law Really Deter?, 42 UCLA L.Rev. 377, 410-13 (1994) [hereinafter Schwartz],

. Principles of federalism and practicality bolster this understanding. Numerous commentators and authorities have recognized states are independent sovereigns in the federal system, and play a historic and important role in the local regulation of health and safety. See, e.g., Ernest A. Young, Federal Preemption and State Autonomy, in Federal Preemption: States’ Powers, National Interests 249, 251-52 (Richard A. Epstein & Michael S. Greve eds., 2007) (noting preemption problematically limits regulatory diversity by constraining state autonomy). Similarly, numerous commentators have noted tort claims operate as an important check even in federally regulated fields. See, e.g., Catherine M. Sharkey, Preemption by Preamble: Federal Agencies and the Federalization of Tort Law, 56 DePaul L.Rev. 227, 230-33 (2007) (criticizing the Consumer Product Safety Commission’s inclusion of an express preemption clause in its mattress flammability standards as "[rjemoving a significant incentive for industries to improve outside of meeting the federal standard” (internal quotation marks omitted)); see also Thomas O. McGarity, The Preemption War: When Federal Bureaucracies Trump Local Juries 236-38 (2008) (explaining common law reinforces incentives for compliance with federal regulations, fills gaps for unanticipated consequences of regulations, and provides protection while agencies take time to formulate responses to problems); Schwartz, 42 UCLA L.Rev. at 385 ("Likewise, tort suits can (first) uncover and (then) dramatize information in a way that can set in motion a regulatory response.”). See generally Thomas H. Sosnowski, Narrowing the Field: The Case Against Implied Field Preemp *400 tion of State Product Liability Law, 88 N.Y.U. L.Rev. 2286, 2293-94 (2013).